# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 2000 Session

## MELANIE TRESSA HEATHMAN-WOOD v. PAUL J. WOOD, ET AL.

**An Appeal from the Chancery Court for Cheatham County**
**No. 9186     Leonard W. Martin, Chancellor**

--------

### No. M1999-00341-COA-R3-CV - August 16, 2000

--------

This is a post-divorce child custody case. When the mother and father divorced, by agreed order, they gave custody of their minor child to the child's maternal aunt and uncle. The aunt and uncle later petitioned the trial court to allow them to move with the child to another state. The father then sought custody of the child. The trial court found that the father had failed to prove a change in circumstances warranting a change in custody from the aunt and uncle. Consequently, the father's petition for custody was dismissed and the aunt and uncle's petition to move to another state was granted. We reverse, finding that an erroneous legal standard was used. The cause is remanded for a determination of whether granting the father's petition for custody would result in substantial harm to the child.

### Tenn. R. App. 3; Judgment of the Chancery Court is Reversed and Remanded

HOLLY K. LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Delilah A. Speed, Columbia, Tennessee, for the appellant, Paul J. Wood.

Rosemary E. Phillips, Goodlettsville, Tennessee, for the appellees, Jodean and Joseph King

### OPINION

On July 24, 1997, Respondent Melanie Tressa Heathman-Wood ("Mother") filed a complaint for divorce against Respondent/Appellant Paul Wood ("Father"). Mother and Father had one child during their marriage, Savannah Katelyn Wood, born December 19, 1995. In a subsequent amended complaint for divorce, Mother alleged that she and Father had been separated since July 4, 1997, that she had maintained custody of Katelyn since their separation, and claimed that she had been Katelyn's primary caregiver since her birth. Mother sought custody of Katelyn during the pendency of the divorce and asked that Father be ordered to pay child support *pendent lite.*

On August 13, 1997, the trial court entered an agreed order granting Mother primary physical custody during the pendency of the divorce. The trial court ordered Father to pay child support

*pendent lite*, and awarded Father visitation every other weekend. The order also stated that Father had agreed not to become intoxicated and operate a motor vehicle while exercising visitation.

On June 18, 1998, Petitioners/Intervenors/Appellees Jodean and Joseph King ("Aunt" and "Uncle"), Mother's aunt and uncle, filed a motion to intervene for custody of Katelyn. In the petition, Aunt and Uncle alleged that they had taken custody of Katelyn at Mother and Father's request. On October 16, 1998, the trial court entered an agreed order granting permission to Aunt and Uncle to intervene as well as an agreed final decree of divorce between Mother and Father. In the divorce decree, the trial court reserved the issues of child custody, support and visitation for later determination. Child support and visitation were to remain as previously ordered until after a hearing to determine the issues.

On December 28, 1998, the trial court entered an agreed order granting custody of Katelyn to Aunt and Uncle. The trial court did not order child support to be paid to Aunt and Uncle "because of the current financial situation of the parents." The trial court granted Mother reasonable visitation on a schedule to be determined by Aunt and Uncle. Father was granted visitation every other weekend and for additional periods on holidays and in the summer.

Less than a month later, on January 25, 1999, Aunt and Uncle petitioned the trial court for permission to move Katelyn to another jurisdiction. In the petition, Aunt and Uncle stated that Uncle had been transferred to Cincinnati, Ohio, as the result of a job promotion. Aunt and Uncle sought to move with Katelyn to Florence, Kentucky, because it would be "closer to Tennessee to accommodate visitation for the child's natural father." They asserted that it would be in Katelyn's best interest to remain in Aunt and Uncle's custody.

Father filed an answer and counter-petition in which he requested sole custody of Katelyn. In the counter-petition, Father asserted that he was employed, that he had remarried, and that he had a stable home. Father stated that, since the agreed order granting custody to Aunt and Uncle, Mother had joined the Navy and was stationed in Michigan. In addition, Uncle had accepted a job in Cincinnati, Ohio. Father argued that these were "material changes in circumstances," and that it was not "in his childs [sic] best interest to move from the State of Tennessee."

A hearing was held on Father's petition for custody and Aunt and Uncle's petition to move Katelyn to another state. At the hearing, Aunt testified that she lived with Uncle, their sixteen-year old son, and Katelyn in their home in Greenbrier, Tennessee, but that the family planned to move to Florence, Kentucky, because of Uncle's promotion. She stated that Florence, Kentucky, is approximately forty minutes from Cincinnati, Ohio, and approximately four hours from Greenbrier, Tennessee. Aunt testified that she and Uncle had decided to live in Florence because it was closer to Tennessee and, consequently, it would be a shorter trip for Katelyn's parents when they exercised visitation.

Aunt testified that she and Uncle took custody of Katelyn in June 1997 at Mother and Father's request. Aunt stated that, when they first took custody, Katelyn was frequently ill and was afraid of men and monsters. She said that Katelyn's physical and emotional health had improved,

but expressed fear that Katelyn would regress if Father were granted custody. Aunt testified that, when Katelyn returns from visitation with Father, she is often sick and is also usually angry and rebellious for several days. Aunt also testified that Father had failed to give Katelyn medication that Aunt had given him.

Aunt stated that Katelyn began acting aggressively toward other children in day care. Consequently, Aunt took Katelyn to a psychologist, Dr. James Hebda ("Dr. Hebda"), in February 1999. Dr. Hebda saw Katelyn five times during February 1999. At the time he saw Katelyn, she had been with Aunt and Uncle approximately eight months. Dr. Hebda did not testify at the hearing; an unsworn letter from him was introduced into evidence. Dr. Hebda's records indicate that Katelyn was seen primarily for the purpose of determining if she had attention deficit disorder or another learning disability which would result in her aggressive conduct in day care. He diagnosed Katelyn as having attention deficit disorder with hyperactivity, and stated that this put her at risk for behavior and learning problems. Nevertheless, in his letter, he also expressed an opinion regarding custody of Katelyn. Aunt brought Katelyn for at least four of her five visits to Dr. Hebda during the one-month period. Evidently, from his letter, Dr. Hebda did not meet with Father, did not observe Katelyn with Father, and relied exclusively on information furnished to him by Aunt or Uncle. The history recited in Dr. Hebda's letter was consistent with Aunt's testimony at the hearing:

> It is my understanding that Katelyn's natural father, Paul Wood, may be attempting to pursue custody of Katelyn. Based on the clinical history of Mr. Wood provided by family members, he displays significant alcohol and drug problems for which he has received in-patient treatment, a potential for violence, suicidal tendencies, and has not been a stable caregiver for Katelyn. Reportedly, after visits with her natural father on weekends, Katelyn is brought back frequently unkempt, with unchanged diapers prior to being toilet trained, and with occasional bruises after being disciplined by her father.

Perhaps not surprisingly, Dr. Hebda concluded that Katelyn should remain in the custody of Aunt and Uncle.[1] He opined that removing Katelyn from the custody of Aunt and Uncle would put her "at additional risk for developing Reactive Attachment Disorder, a serious emotional disorder that stems from a history of unstable attachments with caregivers and could impair her ability to develop meaningful social relationships."

---

[1]Father's attorney objected at the hearing to the trial court's admission of Dr. Hebda's unsworn letter, stating that she had "just now got a copy" of the letter, that Mother's attorney did not disclose the letter until the day before the hearing, and that the information contained in the letter was "total hearsay." The trial court overruled the objections, stating that Father's attorney should have been prepared to rebut the allegations in the letter based on her knowledge of Father's alcohol problems and his suicide attempts and that the trial court "didn't attach great weight to the letter" because it was obvious that "somebody . . . not on [Father's] side of the fence told [Dr. Hebda] these things."

Mother testified at the hearing that she believed that Katelyn should remain with Aunt and Uncle. She stated that Aunt and Uncle's home was "a better home environment" for Katelyn, with two parents instead of one, and that Aunt and Uncle's family "get along." Mother testified that she was no longer in the Navy and that she now lived and worked in Greenbrier, Tennessee. She testified that Aunt told her that she could visit Katelyn on any weekend after Aunt and Uncle move to Florence, Kentucky.

Mother testified that Father abused alcohol during their marriage. She stated that Father still smokes, even though he knows that Katelyn is allergic to cigarette smoke. Mother testified that Katelyn is "rude" and "hateful" after returning from Father's home. She asserted that Katelyn has returned from Father's home with bruises on her legs. When asked how she got the bruises, Mother testified that Katelyn replied, "my daddy whopped me."

Father testified at the hearing that he re-married in January 1999 and that he was employed at Bordeaux Hospital as a licensed practical nurse. He said that he lives with his wife and her eight-year old daughter in a home which his wife owns near Columbia, Tennessee. Father stated that Columbia, Tennessee, is approximately two hours from Greenbrier, Tennessee. Father testified that, if he were awarded custody of Katelyn, Mother could visit Katelyn whenever she desired.

Father admitted that he abused alcohol when he was going through his divorce, but asserted that he no longer consumes alcohol. Father stated that he smokes cigarettes, but that he smokes outside of his home most of the time.

Father testified that he has a very good relationship with his daughter. He denied having ever "abused" her. He stated that he attends church with Katelyn when his work schedule permits. Father testified that he has not medicated Katelyn except as prescribed by her doctor, and that he has never seen Katelyn behave "rebelliously" or "aggressively."

Father testified that he believed that allowing Katelyn to move with Aunt and Uncle would create disruption in her life. He stated that Aunt and Uncle have attempted to poison Katelyn against him and his present wife and that they are trying to take Katelyn away from him. He testified that his work schedule would preclude him from taking three to four days to visit Katelyn.

On March 30, 1999, the trial court entered an order stating:

> . . . while the natural parents have precedent [sic] over other persons with regard to the custody, the Kings, in this case, do have custody of the child by agreement of the natural parents. In order for there to be a change, there must be a showing of a change of circumstance, not just on the part of the non-custodial parent who may have done better since he either lost or gave up custody. There must be a showing of change of circumstance and in this case, the Court finds that there is no showing of change of circumstance other than the fact that Mr. King has a promotion and the family will be moving and the Court find that moving is not the basis for losing custody of the minor child.

The trial court found that Father had remarried and that he now wanted custody of Katelyn, but that "there is no showing that there is a change of circumstance with the custodians that works to the detriment of the child." Consequently, the trial court dismissed Father's petition for custody and granted Aunt and Uncle's petition to move with Katelyn to another state. From this order, Father now appeals.

On appeal, Father argues that the trial court erred in requiring him to demonstrate a "change of circumstance" warranting a change in custody from Aunt and Uncle. Father contends that the "material and substantial change of circumstances" test applies only in custody disputes between two parents. He asserts that, under Tennessee law, in a custody dispute between a parent and a non-parent, a parent cannot be deprived of custody of his child unless there has been a finding that "substantial harm" would result if custody were awarded to the parent. Father claims that, because the trial court made no finding of "substantial harm," its denial of Father's petition was in error.

Aunt and Uncle concede that the trial court based its dismissal of Father's custody petition on a finding that Father had failed to show a material and substantial change of circumstances. However, they contend that the record on appeal demonstrates that Father is unfit and that "substantial harm" will result if Father is granted custody of Katelyn. Aunt and Uncle cite the testimony that Katelyn is often sick after returning from Father's home and that she behaves aggressively and rebelliously. They claim that Father continues to smoke cigarettes in Katelyn's presence despite her allergy to cigarette smoke. Aunt and Uncle assert that Father does not give Katelyn medication as prescribed when she is ill, and that Father has lost his temper and spanked his eight-year old step-daughter.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. *See* Tenn.R.App.P. 13(d). We review questions of law *de novo* with no presumption of correctness in the trial court's decision. *See Ridings v. Ralph M. Parsons Co.,* 914 S.W.2d 79, 80 (Tenn. 1996).

Tennessee courts have long recognized that "the right of a parent is superior in a custody dispute between a parent and a third party." *Doles v. Doles*, 848 S.W.2d 656, 660 (Tenn. Ct. App. 1992). As between a natural parent and a non-parent, the natural parent cannot be deprived of custody of the child unless there has been a finding, after notice required by due process, that substantial harm threatens the child's welfare if custody is given to the parent. *See In re Askew* (*Lewis v. Donoho*), 993 S.W.2d 1, 4 (Tenn. 1999) ("*Askew*"); *see also Dean v. Compton*, No. M1998-00052-COA-R3-CV, 2000 WL 329351, at *13 (Tenn. Ct. App. Mar. 30, 2000). Sufficient grounds for a non-parent to seek custody of a child might include unfitness of the parent and dependency and neglect of the child. *See Askew* at 3-5.

In *Askew*, the mother had asked a third party to care for her child when the child was quite young. *Id.*, 993 S.W.2d at 1. In a "perfunctory order," the juvenile court awarded custody of the child to the third party based on the fact that the child had been living with the third party. *Id.* at 2. There was no allegation or finding of unfitness or dependency and neglect. *See id.* at 2, n. 2. Shortly thereafter, the mother petitioned for custody of the child. After a hearing on the mother's petition,

the juvenile court awarded "temporary custody" of the child to the third party, but noted that it was only "delaying restoring custody to the natural parents" until the mother demonstrated she was able to care for the child. *Id.* at 2. The order was not appealed, but several years later was challenged in court by the mother. *See id.*

In its analysis, the Tennessee Supreme Court in *Askew* emphasized that "a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child." *Id.* at 4. The Court noted that the juvenile court order contained "neither an explicit nor implicit finding of substantial harm," and that the order termed the custody awarded "temporary" and stated that the juvenile court was "only delaying restoring custody" to the mother. *Id.* The Court stated:

> The magnitude of a parent's constitutional right to rear and have custody of his or her children would necessitate a clear finding of substantial harm.
>
> * * *
>
> It appears that no valid determination was ever made that [the mother's] custody of [the child] would result in "substantial harm" to the child. Absent such a finding, we conclude that the deprivation of the custody of her child has resulted in an abridgement of [the mother's] fundamental right to privacy.

*Id.* at 4-5 (citations omitted).

In this case, unlike *Askew*, there is no indication that the agreed order granting custody of Katelyn to Aunt and Uncle was intended as a temporary order. However, as in *Askew*, it does not appear that the custody order was based on a finding, implicit or explicit, that the natural parents were unfit or that substantial harm would result to Katelyn if custody were awarded to one of the natural parents.[2] Therefore, prior to hearing Father's petition for custody, the trial court had not entered an award of permanent custody to Aunt and Uncle, based on a finding, implicit or explicit, that the natural parents were unfit or that substantial harm would result to Katelyn if custody were awarded to one of the natural parents. As set forth in *Askew*, in the absence of an order based on such a finding, in considering Father's petition for custody, the trial court was required to determine if Father was unfit or whether substantial harm would result to Katelyn if Father were awarded custody of her. In the hearing on Father's petition, the trial court held that, in order to be awarded custody, Father was required to show that there was a material change of circumstance regarding Aunt and Uncle. Under the circumstance of this case, we must conclude that the trial court applied an erroneous legal standard.

---

[2]Such "agreed orders . . ., in the interest of facilitating agreement, are unlikely to state expressly that [the natural parent] is unfit or that substantial harm would result from an award of custody" to [the natural parent]. *Dean*, 2000 WL 329351, at *14.

Aunt and Uncle argue on appeal that, even if the order permitting them to retain custody of Katelyn and move was based on an erroneous legal standard, the record supports a finding that Father is unfit or that substantial harm would result to Katelyn from an award of custody to Father. We disagree. The trial court simply did not address the issue of Father's fitness or whether substantial harm would result to Katelyn if custody were awarded to Father. Consequently, on issues on which the testimony conflicted, no determinations of credibility were made. Moreover, even if the trial court had resolved all issues of credibility against Father, his testimony is undisputed that he no longer consumes alcohol, does not smoke cigarettes in his home, and that he now has a stable home environment. Consequently, we must remand this cause for a hearing on Father's petition, applying the appropriate legal standard. On remand, the parties shall not be limited to the evidence already presented below, but shall be permitted, in the trial court's discretion, to submit evidence relevant to the issues, including but not limited to full examination of Dr. Hebda if requested.

In sum, we reverse the trial court's denial of Father's petition for custody and its grant of Aunt and Uncle's petition to retain custody of Katelyn and move her to another jurisdiction. We remand the case to the trial court for determination of whether Father is unfit or whether substantial harm would result if custody of Katelyn were awarded to Father. If such a finding is made, the trial court may then evaluate custody in light of the best interests of the child. *See Askew*, 993 S.W.2d at 4; *see also Bond*, 896 S.W.2d at 548, and *Dean*, 2000 WL 329351, at *15.

The decision of the trial court is reversed and remanded. Costs are taxed against Appellees, Jodean and Joseph King, for which execution may issue if necessary.

---

HOLLY KIRBY LILLARD, J.